# Illinois Official Reports

## Appellate Court

---

### *Crim v. Dietrich*, 2016 IL App (4th) 150843

---

| | |
|---|---|
| Appellate Court Caption | COLLIN CRIM, A Minor, By His Parents and Next Friends, KRISTOPHER CRIM and TERI CRIM, Individually, Plaintiffs-Appellants, v. GINA DIETRICH, D.O., Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-15-0843 |
| Filed | November 7, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Adams County, No. 06-L-89; the Hon. Mark A. Drummond, Judge, presiding. |
| Judgment | Reversed; cause remanded. |
| Counsel on Appeal | Jonathan T. Nessler (argued), of Law Offices of Fredric W. Nessler & Associates, Ltd., of Springfield, for appellants.<br><br>Craig L. Unrath (argued), of Heyl, Royster, Voelker & Allen, of Peoria, and Adrian E. Harless and Tyler Robinson, of Heyl, Royster, Voelker & Allen, of Springfield, for appellee. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Holder White and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1   In August 2015, plaintiffs, Kristopher Crim and Teri Crim, acting on behalf of their biological son, Collin Crim (born June 17, 2005), filed a fourth amended medical malpractice claim against defendant, Gina Dietrich, D.O., alleging that she failed to comply with the standard of care applicable to an obstetrician. The Crims claimed, in pertinent part, that Dietrich's negligent failure to obtain Teri's informed consent prior to Collin's natural birth resulted in a fracture to Collin's right clavicle and nerve damage that extended down his right side to his shoulder, wrist, hand, and fingers.

¶ 2   Following the presentation of the Crims' case at a September 2015 jury trial, Dietrich moved for a partially directed verdict on the issue of informed consent, which the trial court granted. Thereafter, following additional evidence and argument, the jury returned a verdict in Dietrich's favor and against the Crims on their remaining claim, which sought to recover medical expenses under section 15 of the Rights of Married Persons Act (750 ILCS 65/15 (West 2014)). The court later imposed costs on the Crims as permitted by section 5-109 of the Code of Civil Procedure (Code) (735 ILCS 5/5-109 (West 2014)).

¶ 3   The Crims appeal, arguing that the trial court erred by (1) granting Dietrich a directed verdict on the issue of informed consent and (2) barring certain medical testimony. Because we agree with the Crims' first argument, we reverse.

¶ 4                                    I. BACKGROUND
¶ 5                                   A. Informed Consent
¶ 6   Because our resolution of this case concerns the trial court's grant of a directed verdict in Dietrich's favor on the issue of informed consent, we provide the following brief explanation of that concept to place the Crims' claim in its proper context.

¶ 7   In a medical malpractice action raising a lack of informed consent, a plaintiff must prove that a physician "should have informed the patient, prior to administering medical treatment, of the diagnosis, the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." (Internal quotation marks omitted.) *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 53, 957 N.E.2d 413 (quoting *Coryell v. Smith*, 274 Ill. App. 3d 543, 549, 653 N.E.2d 1317, 1321 (1995), quoting *Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985)). At issue in this case is the Crims' claim that Dietrich should have informed Teri about alternatives to natural childbirth.

¶ 8                                   B. The Crims' Claim
¶ 9   In August 2015, the Crims, acting on behalf of their minor son, Collin, filed a fourth amended medical malpractice claim against Dietrich, alleging that she failed to comply with the standard of care applicable to an obstetrician. Essentially, the Crims claimed that during Teri's pregnancy, Dietrich failed to inform Teri that (1) Collin's increasing weight would place him at risk for injury if he was delivered by natural childbirth and (2) Teri had the option of delivering Collin by cesarean section (C-section) to mitigate possible injury. During Collin's June 17, 2005, natural delivery, he suffered shoulder dystocia—that is, an obstructed labor whereby after the delivery of the head, the anterior shoulder of the infant cannot pass or

requires significant manipulation. As a result, Collin suffered a clavicle fracture and "extensive injury" to the network of nerves known as the brachial plexus. See http://www.mayoclinic.org/diseases-conditions/ brachial-plexus-injury/home/ovc-20127336 (last visited Sept. 26, 2016) (defining brachial plexus as a "network of nerves that sends signals from your spine to your shoulder, arm[,] and hand"). In their prayer for relief, the Crims sought a judgment in their favor and compensation for Collin's injuries.

¶ 10                              C. The Evidence at Trial

¶ 11    At a September 2015 jury trial on the Crims' medical malpractice suit, they presented the following evidence.

¶ 12    In September 2004, Teri discovered that she was pregnant with her first child. In October 2004, Teri made an initial appointment to see Dietrich, who administered Teri's prenatal care throughout the pregnancy. Dietrich performed ultrasounds in October 2004, January 2005, and April 2005. Teri noted that Dietrich performed the April 2005 ultrasound because Dietrich was concerned that Collin "was measuring large." After conducting that ultrasound, Dietrich confirmed that (1) Teri's fluid levels were "okay" and (2) Collin was progressing normally. In May 2005, Dietrich told Teri that Collin would be about eight pounds at birth. Thereafter, Dietrich did not discuss again Collin's weight with Teri. Ten days after Teri's June 6, 2005, expected delivery date, Dietrich induced Teri's labor at a local hospital. Collin was born 26 hours later, weighing 11 pounds, 2 ounces.

¶ 13    Teri testified that during her prenatal care, Dietrich did not discuss (1) Collin's weight, (2) potential complications associated with the natural birth of a large infant, or (3) the option of Teri delivering Collin by C-section. After Collin was born, radiography confirmed that he had a fractured clavicle. Shortly thereafter, Teri learned that Collin had injured his brachial plexus. In the first few days after Collin's birth, Teri observed that he did not move his right arm, turn his hand, or move his fingers.

¶ 14    In February 2006, pediatric neurosurgeons surgically repaired Collin's brachial plexus by grafting a nerve from Collin's leg into his neck. Teri then recounted her biannual trips to St. Louis for occupational and physical therapy to improve Collin's gross motor skills, such as catching a ball and lifting his hand up to his mouth. (Each therapy session, which occurred for about an hour, was recorded and published to the jury.) Teri opined that during the November 2007 therapy session, she saw "real improvement" and Collin "was actually gaining a little bit of his *** movement back." Teri noted, however, that Collin's limited range of movement affected the type of clothing they purchased for him, explaining "[w]e couldn't buy [Collin] real tight shirts, things like that, because that would be very difficult, and [Collin] would get upset trying to put clothes on like that." Teri acknowledged that despite his progress, 10-year-old Collin could not lift or pour a full gallon of milk and had difficulty reaching above his head. Teri stated that Collin (1) does not talk about his injury, (2) does not want others to know about his injury, and (3) will change the subject if someone attempts to discuss his injury.

¶ 15    Teri reiterated that Dietrich never told her that (1) Collin was a large baby, (2) the complications that might arise with the natural delivery of a large baby, or (3) a C-section delivery could have avoided Collin's clavicle fracture and brachial plexus injury. Teri stated, "[h]ad I known that there was a chance of shoulder dystocia, or brachial plexus or what could happen, I would have opted for a C-section."

- 3 -

¶ 16    Dietrich, who testified as an adverse witness, had been Teri's obstetrician from November 2004 to June 2005. During that time, Dietrich acknowledged using a "fundal height" centimeter measurement to "track the progress" and "compare" that length to the weeks of gestation to ensure the proper correlation. Dietrich then explained that the fundal height measurements she took at weeks 26, 28, 30, and 32 of Teri's pregnancy showed fundal height lengths that were approximately 3 to 4 centimeters greater than the expected factor for those respective weeks of gestation. One of Dietrich's concerns with the measurements was that unborn Collin might be "large for his gestational age."

¶ 17    Dietrich confirmed that the definition of fetal macrosomia is when "a fetus is in the 90th percentile of size," which occurs "at the term of the pregnancy" and at 4500 grams (approximately 9.92 pounds) to 5000 grams (approximately 11.02 pounds). Prior to term, Dietrich generally assesses whether the fetus is large for the corresponding gestational age. At term, Dietrich evaluates whether the fetus is macrosomic. One week prior to Collin's birth, Dietrich told Teri that she estimated Collin's weight at birth to be eight or nine pounds. Dietrich agreed that "a major concern in delivery of macrosomic infants is shoulder dystocia and the attendant risk of permanent brachial plexus palsy." Dietrich noted that one way to avoid shoulder dystocia is to deliver a fetus by C-section, which avoids navigation of the birth canal and, as a result, prevents the shoulder from becoming impacted during that navigation.

¶ 18    Dietrich admitted that "the appropriate management of shoulder dystocia begins with recognition that the condition exists." Dietrich then explained, as follows:

> "Shoulder dystocia is an obstetrician's nightmare. We know that the timeframe is limited to get the baby delivered safely or severe consequences can happen, and so I went to my maneuvers, and after I tried to move the shoulders, once again I have to try to use traction to remove the baby, and perhaps the shoulders had moved enough that I was able to do that a second time."

Dietrich admitted that (1) her use of traction in attempting to extract Collin from the birth canal might have caused Collin's brachial plexus injury and (2) a reasonably careful obstetrician would have discussed with an expectant mother the option of delivering a fetus with an estimated weight of 5000 grams or more by C-section.

¶ 19    Michael Benson, an obstetrician, testified on behalf the Crims that during pregnancy, especially in the third trimester, he assesses risk factors related to blood pressure, diabetes, the mother's weight gain, and fetal growth. Benson acknowledged that fetal growth can be measured by (1) using a fundal height measurement, (2) palpating the abdomen, (3) performing an ultrasound, or (4) performing a pelvic exam. With regard to fundal height, Benson noted that the measurements are examined for a "normal growth pattern," typically beginning at week 20 of the pregnancy. Benson explained further, as follows:

> "[T]here's a relationship to the number of centimeters *** from 20 to 32 weeks and so generally, if I exam [sic] a patient and she's 25 weeks along, her fundal height will be 25 centimeters. What's interesting, though, is that this relationship falls off at about 32 weeks and so what happens is the baby continues to grow but the relationship is no longer one centimeter per week."

Benson continued that after 32 weeks, the fundal height starts to fall off and is no longer a one-to-one ratio. Benson noted that "the baby is actually growing at an absolute rate faster than it was before," but experience has shown that after week 32, a fetus's growth is "filling out the abdomen instead of just primarily growing upward."

¶ 20     Benson noted that macrosomia occurs in fetuses that weigh 4500 grams or more. Such a diagnosis causes concern because, although the head is the largest part of a fetus, the shoulders of a fetus weighing more than 4500 grams could get stuck during natural delivery, which is referred to as shoulder dystocia. Shoulder dystocia could cause temporary or permanent injury, brain damage, or death. Benson advised that an estimated fetal weight should be performed when the patient is admitted with labor pains, explaining that the risk of shoulder dystocia for all fetuses is 1.4%, but that risk increases to 9.4% for fetuses weighing 4500 grams and can be as high as 20% for fetuses weighing more than 5000 grams.

¶ 21     The following exchange then occurred:

"[CRIMS' COUNSEL]: Is there any way to avoid *** a shoulder dystocia that takes place during a vaginal birth?

[BENSON]: Well, if the head is already delivered, there's no way to avoid it. Obviously, one way to avoid a shoulder dystocia would be to do a [C-section] at some point before the head comes out, but basically *** there has to be a reason for that.

[CRIMS' COUNSEL]: And what reasons come to mind that might suggest a [C-section] instead of a vaginal birth?

[BENSON]: *** [N]ormally, these reasons occur before the start of labor and they're *** chiefly related to estimates of fetal weight and so *** the standard of care is to offer a woman a [C-section] if the estimated fetal weight is 5,000 grams or more."

¶ 22     Benson acknowledged that Dietrich ordered an ultrasound in April 2005 because she was concerned that unborn Collin was large for his gestational age, but after reviewing the report generated by that ultrasound, Benson commented that the "report was conspicuous for information that it [did not] have." Specifically, Benson concluded that the report was incomplete because it neither documented an estimated fetal weight nor a percentile value, which Dietrich could have easily obtained by requesting it from the ultrasound computer database. Benson added that generally, an obstetrician would begin having a discussion with the expectant mother about macrosomia when a fetus is 4500 grams. Such a discussion would include the risks to the fetus as well as options, such as a C-section, and the associated risks such a procedure poses to the mother and child. Benson noted that inducing labor "is thought to increase the risk of shoulder dystocia by at least two-fold."

¶ 23     Benson revealed that during his review of Teri's medical records, he did not find documentation that Dietrich (1) estimated Collin's fetal weight, (2) discussed the possibility that Collin might be macrosomic with Teri, (3) communicated to Teri the risks associated with the vaginal delivery of a macrosomic fetus, or (4) informed Teri of the benefits and disadvantages of a natural childbirth versus a delivery by C-section.

¶ 24     Based on his review of the medical reports and depositions, Benson opined to a reasonable degree of medical certainty that Dietrich's performance fell below the standard of care for an obstetrician in that Dietrich (1) relied on an incomplete April 2005 ultrasound report to rule out that Collin was potentially macrosomic, (2) failed to recognize that Collin was macrosomic based on Teri's fundal height measurements and April 2005 clinical presentation, (3) failed to estimate fetal weight within 48 hours of delivery, and (4) choose not to order an ultrasound immediately prior to Teri's induction. Benson also opined to a reasonable degree of medical certainty that Collin's brachial plexus injury (1) was caused by Dietrich's negligence in proceeding with a natural childbirth and (2) would have more likely than not been avoided had

Dietrich performed a C-section.

¶ 25                    D. Dietrich's Motion for a Directed Verdict

¶ 26    At the close of the Crims' case in chief, Dietrich moved for a directed verdict on the issue of informed consent. Relying on this court's decision in *St. Gemme v. Tomlin*, 118 Ill. App. 3d 766, 455 N.E.2d 294 (1983), Dietrich argued, as follows:

> "The *St. Gemme* case makes it very clear that in an informed consent case, you cannot rely solely on the testimony of the patient as to what they would have done. *** The standard of an informed consent is an objective standard. What would a reasonable person do under those circumstances?
>
> What [the Crims] failed to do in this case was to establish, by expert testimony, that a reasonable patient would not have a vaginal birth and would pursue a [C-section] instead. That's the fatal flaw in their case. Without that necessary link, all of the negligence that they allege in the prenatal care, all of the things they say *** Dietrich should have done lead to a dead end before you get to the question of damages because they didn't establish, by expert testimony, that a reasonable patient in [Teri's] position would have elected to have a [C-]section."

¶ 27    After taking a short recess, the trial court found that *St. Gemme* was controlling precedent and granted Dietrich's motion for a directed verdict on the issue of informed consent.

¶ 28                         E. Subsequent Proceedings

¶ 29    Thereafter, Dietrich presented testimony in her case in chief. (We omit a summation of that testimony because it is not pertinent to the resolution of this case.)

¶ 30    Following argument, the jury returned a verdict in Dietrich's favor and against the Crims. The court later entered a written order, imposing costs on the Crims as permitted by section 5-109 of the Code.

¶ 31    This appeal followed.

¶ 32                              II. ANALYSIS

¶ 33    The Crims appeal, arguing, in pertinent part, that the trial court erred by granting defendant a directed verdict on the issue of informed consent. Essentially, the Crims claim that the court incorrectly determined that the Crims were required to present expert medical testimony that Teri would have elected a C-Section over natural childbirth. We agree.

¶ 34             A. The Required Elements To Prove Informed Consent

¶ 35    A plaintiff must prove the following four essential elements to prevail in a medical malpractice action under a theory of informed consent: "(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment." (Internal quotation marks omitted.) *Davis v. Kraff*, 405 Ill. App. 3d 20, 28-29, 937 N.E.2d 306, 314-15 (2010) (quoting *Coryell*, 274 Ill. App. 3d at 546, 653 N.E.2d at 1319). As framed by the parties, the issue in this case concerns the third element. In this regard, "[t]he gravamen in an informed consent case requires the plaintiff to point to significant undisclosed

- 6 -

information relating to the treatment which would have altered her decision to undergo it." (Internal quotation marks omitted.) *Id.* at 29, 937 N.E.2d at 315.

¶ 36                                    B. This Court's Decision in *St. Gemme*

¶ 37     Because the trial court's grant of a directed verdict in Dietrich's favor was based on this court's decision in *St. Gemme*, we provide the following brief summary of that case.

¶ 38     In *St. Gemme*, 118 Ill. App. 3d at 767, 455 N.E.2d at 295, the plaintiff saw the defendant dentist for a problem tooth that the defendant later determined was so diseased that "[t]he only remedy was extraction, a difficult and complicated procedure." A possible consequence of the extraction, which the defendant failed to disclose to the plaintiff, was the possibility of a loss of lip sensation, referred to as paresthesia. *Id.* at 768, 455 N.E.2d at 295. Left untreated, however, the tooth would have become infected and posed a life-threatening condition. *Id.* at 767, 455 N.E.2d at 295. After undergoing the extraction, the plaintiff suffered paresthesia, which was likely a permanent condition. *Id.* at 768, 455 N.E.2d at 295. The plaintiff sued, alleging that the defendant failed to obtain her informed consent. *Id.*

¶ 39     The *St. Gemme* court noted that the ensuing trial turned into a battle of the experts. *Id.* at 768, 455 N.E.2d at 296. The plaintiff's expert testified that the standard of care for the extraction required the defendant to disclose the risk of postoperative paresthesia. *Id.* One of the defendant's experts averred that no such requirement existed at the time the procedure was performed. *Id.* The defendant's second expert testified that no reasonable person would have refused the treatment the defendant administered. *Id.* at 769, 455 N.E.2d at 296. However, all of the experts (1) "testified that there was no reasonable alternative" to the extraction and (2) "agreed that within a short time the tooth would become abscessed and hence[,] life threatening." *Id.* The jury found in favor of the defendant and the plaintiff appealed. *Id.* at 768, 455 N.E.2d at 296.

¶ 40     On appeal, this court noted the following on the issue of proximate cause:

> "In all but the most gross malpractice cases there must be expert evidence not only as to the negligence of the defendant but also as to a proximate causal connection between the negligence and the injury suffered by the plaintiff. [Citation.] This principle is applicable to failure-to-warn cases. [Citation.] In the instant case the only evidence on this matter favorable to the plaintiff came from the plaintiff herself who testified that if she had known of the risk, she would not have submitted to the procedure. All of the expert evidence, both plaintiff's expert and defendant's experts, was to the contrary.
>
>     All of the experts testified that there was no reasonable alternative." *Id.* at 769, 455 N.E.2d at 296.

¶ 41     In affirming the jury's verdict and concluding that the "plaintiff failed to meet her burden of proof on the question of proximate cause" (*id.*), this court agreed with the following rationale provided by the Supreme Court of California in *Cobbs v. Grant*, 502 P.2d 1, 11-12 (Cal. 1972):

> "The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the

physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils."

¶ 42                                C. Dietrich's Response

¶ 43    In response to the Crims' argument, Dietrich claims, as she did in the trial court, that the Crims failed to establish—through expert testimony—that a reasonable person in Teri's position would not have opted for a vaginal birth and, instead, would have elected to undergo a C-section procedure if Dietrich had provided that option. In support of that claim, Dietrich posits, as follows:

"*St. Gemme* held that in 'all but the most gross malpractice cases' there must be expert evidence not only as to the negligence of the defendant but also as to the proximate causal connection between the negligence and the plaintiff's injury. The trial court recognized that this case was not one of 'gross negligence,' which meant that it [was] essential to have at least some expert testimony as to what a reasonably prudent patient would do given all the options."

We disagree with Dietrich's interpretation of *St. Gemme*.

¶ 44    In *St. Gemme*, this court affirmed the jury's finding in favor of the defendant dentist because the plaintiff failed to present any evidence whatsoever that the defendant could have performed, for example, another procedure that would have addressed her dental concerns instead of the extraction that carried the risk of paresthesia. Although the defendant solicited expert testimony that no reasonable person would have refused the treatment the defendant administered, our affirmance of the jury's verdict in *Gemme* was not based on that evidence. Instead, our determination was based on expert medical testimony that no viable alternative existed to the extraction procedure performed other than to elect not to proceed with that procedure, which all the experts in *St. Gemme* agreed would have been fatal. That specific testimony—that is, that no viable alternative to the extraction existed—could only have been solicited from experts in the field of dentistry or oral surgery, as occurred in *St. Gemme*. Thus, absent a viable alternative, the plaintiff's testimony in *St. Gemme* that she would have opted to forego the extraction if the defendant alerted her to risk of paresthesia was, at best, self-serving.

¶ 45    In addition, we question (1) the logic of requiring expert medical testimony from, for example, an obstetrician, as to what a reasonable person would do when faced with various medical options and (2) how that opinion testimony is relevant or admissible, given that it is not within the scope of the obstetrician's expertise. Simply put, we view *St. Gemme* as procedurally distinct and conclude that it does not stand for the proposition that Dietrich asserts.

¶ 46    In *Coryell*, 274 Ill. App. 3d at 546, 653 N.E.2d at 1319, the First District reversed the trial court's grant of summary judgment in the defendant's favor because it concluded that in the underlying medical malpractice action involving informed consent, the plaintiff "was not required to present expert evidence specifically as to proximate causation." The *Coryell* court acknowledged that "expert evidence is generally necessary to assist the jury in determining whether the physician's breach of his duty to diagnose or to timely diagnose proximately caused the plaintiff's injury since that determination usually requires knowledge, skill, or

training in a technical area outside the comprehension of lay persons." *Id.* at 549-50, 653 N.E.2d at 1321. However, pertinent to this appeal, the First District continued, as follows:

> "In an informed consent action, however, after they have been educated as to the information that the physician should have disclosed to the plaintiff ***, no one is in a better position than the jury to determine whether any alleged undisclosed information would have altered the plaintiff's decision to undergo the proposed treatment had it been disclosed. Moreover, since the issue of proximate causation in an informed consent case relates to what a person of ordinary prudence would do under the same or similar circumstances as those confronting the plaintiff, it is even more compelling that the members of the jury, based on their own knowledge and experience, and using their native common sense, understand and determine the issue of whether, after proper disclosure, a prudent person would have nonetheless proceeded with the proposed treatment." *Id.* at 550, 653 N.E.2d at 1321.

We agree with *Coryell*.

¶ 47    Dietrich acknowledges *Coryell*, but she argues that the trial court in the instant case was bound by this court's decision in *St. Gemme*, which Dietrich contends is in direct conflict with the First District's decision in *Coryell* on the issue of whether expert testimony is required to determine what a reasonably prudent patient would do given available medical options. However, for the reasons we have already mentioned, we disagree with Dietrich's characterization and conclude that no conflict exists.

¶ 48    In this case, we agree with the Crims that the trial court erred by granting a partial directed verdict in Dietrich's favor on the issue of informed consent because the Crims presented competent evidence that (1) an alternative to the natural birth procedure existed, (2) the alternative procedure could have mitigated the injuries Collin sustained, and (3) Teri testified that had she been advised of that alternative, she would not have proceeded with the natural childbirth. See *Schiff v. Friberg*, 331 Ill. App. 3d 643, 657-58, 771 N.E.2d 517, 530 (2002) ("A directed verdict should not be granted if there is any evidence demonstrating a substantial factual dispute or where the credibility of witnesses is at issue."). Accordingly, we reverse the trial court's judgment and remand for a new trial.

¶ 49    In so concluding, we note that in their appeal, the Crims also raise an evidentiary claim. However, because we have reversed and remanded for a new trial, we decline to address the Crims' evidentiary claim.

¶ 50                                              III. CONCLUSION

¶ 51    For the foregoing reasons, we reverse the trial court's judgment and remand for further proceedings.

¶ 52    Reversed; cause remanded.