**SIXTH DIVISION**
October 8, 2010

No. 1-09-1181

| | | |
|---|---|---|
| MARLA DAVIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 L 15200 |
| | ) | |
| COLMAN KRAFF and KRAFF EYE | ) | |
| INSTITUTE, LTD., | ) | The Honorable |
| | ) | Claire E. McWilliams, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE GARCIA delivered the opinion of the court.

Plaintiff Marla Davis appeals from a jury verdict in favor of defendants Dr. Colman Kraff and the Kraff Eye Institute, Ltd. (KEI), in her medical negligence action following two laser-assisted in situ keratomileusis (LASIK) eye surgeries. Ms. Davis's action was premised on the defendants' alleged failure to inform her that she had an increased risk of nighttime vision problems following LASIK surgery based on her claimed abnormally large night-adjusted pupils. Ms. Davis contends she should receive a new trial because Judge Clare E. McWilliams abused her discretion in admitting testimony by defense experts in two areas: (1) an expert testified that research conducted after Ms. Davis's surgeries revealed that large night-adjusted pupils are not predictive of post-LASIK nighttime vision problems; and (2)

experts opined that Ms. Davis's large night-adjusted pupils at the time of trial were caused by her use of certain antiallergy and antidepressant medications. We hold Judge McWilliams properly admitted the disputed testimony by defense experts for the express purpose of rebutting the testimony of the plaintiff's experts as to the cause of her enlarged pupils and her ultimate injuries. We affirm.

## BACKGROUND

Plaintiff Marla Davis developed nighttime vision problems after the defendants performed LASIK surgery on both eyes in July 1998. A second LASIK "enhancement" procedure in August 1999 sought to address the problems. In her second amended complaint, Ms. Davis alleged that prior to the surgeries, the defendants failed to discover that she had abnormally large night-adjusted pupils and, as a consequence, failed to inform her that her large dilated pupils increased the risk that she would develop postsurgical nighttime vision problems. The trial became a classic battle of experts.

## LASIK Surgery

Dr. Martin Markowitz, an ophthalmologist and the first of the plaintiff's experts to present testimony, outlined for the jury in his videotaped deposition the eye's basic anatomy and how the LASIK procedure impacts the structure. Dr. Markowitz described the cornea as the "clear window of the eye in which a contact lens sits." Beneath the cornea is the pupil, a space in

the center of the colored portion of the eye or iris.  The pupil controls the flow of light to the retina in the back of the eye by contracting in bright light and dilating in dim light.  The retina processes the light admitted through the pupil into an image.  In many cases of nearsightedness, the cornea improperly refracts light, misdirecting the light to an area slightly in front of the retina rather than squarely on its surface.  LASIK surgeons use a laser to "ablate," or dissolve, a portion of the corneal tissue to shorten the distance between the cornea and the retina to correct the refractive error in nearsighted patients.

When LASIK was first developed, the eye surgery lasers available for use by ophthalmologists could only "ablate" a section of the cornea up to five millimeters in diameter.  At the time, ophthalmologists believed that if a patient's dilated pupils exceeded five millimeters, the patient might perceive postsurgery glare when light strikes an untreated portion of the cornea as it passes through the pupil to the back of the eye.  By the time of Ms. Davis's first surgery in 1998, technological advancements expanded the diameter of eye surgery lasers to 6 millimeters, and by the time of Ms. Davis's second surgery in 1999, the laser diameter had expanded to 6½ millimeters.

### LASIK Treatments

Ms. Davis testified that on July 16, 1998, she went to KEI for a consultation.  She met Dr. Kraff, who explained how LASIK surgery works.  Ms. Davis quoted Dr. Kraff as stating she "would

3

be the ideal candidate for this procedure." Dr. Kraff gave Ms. Davis a medical consent form, which she read and initialed. Specifically, Ms. Davis initialed a paragraph that detailed possible problems a LASIK patient might experience postsurgery: "at night there may be a 'starbursting' or halo effect around lights," a condition which "could be permanent." The consent form cautioned that her postsurgical vision "may not seem as sharp at night as during the day and that [she] may need to wear glasses at night." The consent form also disclosed the risks of total blindness and the loss of her eyes should rare complications occur. Ms. Davis testified that although she signed the form, she "wasn't willing to undergo any additional risks for a procedure when I could see very well already." Dr. Kraff did not inform Ms. Davis that she faced increased risks for other possible problems. Ms. Davis could not recall whether the diameter of her pupils was measured during the initial consultation. Dr. Kraff scheduled Ms. Davis to undergo LASIK surgery on both eyes six days later.

Two days prior to the surgery, Ms. Davis returned to KEI to be examined "a little more in depth." Ms. Davis testified she was never examined "in a room where they turned the lights down all the way." However, according to KEI records in evidence, KEI employee Mark Whiteside examined Ms. Davis prior to her initial surgery and recorded the diameter of her pupils as three millimeters in bright light and five millimeters in dim light.

4

Dr. Kraff performed LASIK surgery on both eyes as scheduled, using an eye surgery laser with a diameter of six millimeters. A videotape of the surgery was played for the jury. Dr. Kraff later testified that the videotape showed Ms. Davis's pupils ranged in diameter from three millimeters in normal light to six millimeters in dim light.

Ms. Davis testified that shortly after surgery she experienced nighttime vision problems, including glare and halos around lights, which she reported to the defendants. Dr. Kraff informed her that such problems were to be expected during the healing process and with time the problems would clear up.

Approximately 10 months later, Ms. Davis returned to KEI with the same complaints of nighttime vision problems, including "glare[,] halos[, and] starbursting." According to Ms. Davis, Dr. Kraff again said the problems were temporary. He also gave her a prescription for eyeglasses because the visual acuity in her left eye remained imperfect even after the LASIK procedure.

About a month later, Ms. Davis returned to KEI because her nighttime vision problems continued. KEI's clinical manager, Monica Bowles Watson, testified she measured the diameter of Ms. Davis's pupils on this visit as four millimeters in normal light and six millimeters in dim light. To measure Ms. Davis's pupils in dim light, Ms. Watson turned off all the lights in the exam room, except the desk light, for 10 minutes. She then measured the diameter of Ms. Davis's pupils by comparing them to a chart.

5

Dr. Kraff also testified that on this visit he examined Ms. Davis with a retinoscope, which uses a point of light directed to the eye in dim conditions to accurately estimate the pupil's diameter. Ms. Davis's eyes tested normal under the retinoscope.

Ms. Davis testified, however, that on June 21, 1999, Dr. Kraff "told me that my pupils dilate larger [than normal]," and that she was perceiving glare when her pupils dilated to a greater diameter than the cornea area he treated in the LASIK procedure. According to Ms. Davis, Dr. Kraff suggested that she stop taking her anitallergy prescription medication, Allegra-D, to "see if that helps." Dr. Kraff testified that he asked Ms. Davis to stop using Allegra-D for a few days because a compound in that medicine, pseudoephedrine, can cause pupils to dilate to a larger size than normal. Ms. Davis testified she stopped taking Allegra-D, but did not notice any improvement in her vision. According to Ms. Davis, Dr. Kraff stated if her symptoms did not improve he could perform "an enhancement *** that's made for larger pupil size." She elected to have the enhanced LASIK surgery.

On August 23, 1999, Ms. Davis met with Dr. Kraff and signed a medical consent form identical to the form she signed for the first LASIK surgery. That same day, KEI technician Laura Dominow measured the diameter of Ms. Davis's pupils. To conduct the measurement, Ms. Dominow turned off all the lights in the exam room except for a small "can light." She recorded the diameter

of Ms. Davis's pupils as four millimeters in normal light and six millimeters in dim light.

Dr. Kraff performed the enhancement surgery on August 24, 1999, using an eye surgery laser 6½ millimeters in diameter. A videotape of that surgery was played for the jury. Defense expert Dr. Steven Schallhorn later testified that the videotape showed Ms. Davis's pupils varying in diameter from "three [to] maybe a little less than six" millimeters, depending on the lighting conditions.

Ms. Davis testified she returned to KEI shortly after the "enhancement" surgery and reported that she was still having vision problems in dim lighting. She was told this was part of the healing process and it might take up to two years for the problems to resolve following a second LASIK procedure. Shortly thereafter, Ms. Davis moved from Illinois.

After two years passed, with Ms. Davis continuing to experience nighttime vision problems, she consulted three ophthalmologists near her Cleveland, Ohio, home: Drs. Martin Markowitz, Greg Louis, and Jack Peretz. Ms. Davis was first examined by Dr. Markowitz. In his videotaped deposition, Dr. Markowitz testified to his measurement of Ms. Davis's pupils. Dr. Markowitz turned off the lights in the examination room, except for a dim light placed behind Ms. Davis and placed a pupil gage underneath her eyes. He found Ms. Davis's pupils dilated to nine millimeters, which was much greater than the diameter of eye

surgery lasers available in 1998 and 1999. Dr. Peretz also measured Ms. Davis's pupils, using a procedure similar to Dr. Markowitz's. Ms. Davis testified Dr. Peretz's examination room was "a lot darker" than the KEI rooms where she was examined. Dr. Peretz confirmed that Ms. Davis's dilated pupils were abnormally large. Finally, Dr. Louis measured Ms. Davis's pupils and also concluded that when dilated, they were abnormally large.

Ms. Davis published to the jury two photographs of herself in dim lighting, one taken in 1995 and the other in 2008. She testified that these photographs accurately depicted her pupils dilating to the same size before and after her LASIK surgery. Dr. Howard Siegel, another of Ms. Davis's experts, later testified that Ms. Davis's pupils in the photographs were 8½ millimeters in diameter.

The parties presented expert testimony regarding the causes of Ms. Davis's enlarged pupils and of her nighttime vision problems. As detailed below, the defendants' experts generally asserted that Ms. Davis's enlarged pupils, or "mydriasis," at the time of trial were the product of her use of certain antiallergy and antidepressant medications after her surgeries. Ms. Davis's experts asserted that her nighttime vision problems were the result of the defendants' LASIK surgery on a patient with abnormally large night-adjusted pupils. According to her experts, Ms. Davis's enlarged dilated pupils were not medication induced.

8

Plaintiff's Causation Experts

Dr. Markowitz gave his opinion: "If the ablation zone [of the eye surgery laser] is smaller than what the pupil dilates to," the patient may perceive glare or other distortions at night following LASIK surgery.

Dr. Siegel testified that while medication-induced mydriasis would manifest in enlarged pupils, with such mydriasis the pupil would not dilate or contract in response to the lighting conditions. In his examination of Ms. Davis on April 16, 2007, and on March 27, 2008, he did not observe that condition. In each of his examinations, he measured the diameter of Ms. Davis's pupils in dim light as 8½ millimeters. Dr. Siegel also noted that before the second examination, Ms. Davis stated that she was not using antiallergy or antidepressant medications. Dr. Siegel admitted he lacks expertise in the technical aspects of LASIK surgery, which he does not perform. Nonetheless, he opined that light passing through the untreated zone of Ms. Davis's cornea into her unusually large dilated pupils caused her nighttime vision problems.

Richard Fiscella, a registered pharmacist with a master's degree in public health, and a professor in the departments of pharmacy and ophthalmology at the University of Illinois at Chicago, testified as an expert in ocular pharmacology, "the study of medication used in the eye or effects of medication on the eye." Professor Fiscella is a section editor of two

textbooks in the field: "Clinical Ocular Pharmacology" and "Ophthalmic Drug Facts." Professor Fiscella opined that none of the medications Ms. Davis used, including Allegra-D, Zoloft, and Cymbalta, cause mydriasis. Although the textbooks he edited, as well as those relied on by the defendants' experts, discuss the effects of general classes of drugs on pupil dilation, no specific drug or dosage is identified. As an example, Professor Fiscella noted that Tylenol falls in the class of drugs that might induce mydriasis according to the textbooks, although no report has ever connected Tylenol with mydriasis. Thus, Professor Fiscella testified, even if a drug falls within a class of medicines linked to mydriasis, a doctor cannot conclude with "reasonable certainty that a particular drug in that class causes mydriasis." To establish a causal connection between a drug and mydriasis, a doctor would need to review case studies and reports linking mydriasis to a specific dosage of the medicine. Professor Fiscella added that medication-induced mydriasis enlarges the pupil in all conditions, not just dim lighting. Ms. Davis did not report such symptoms. On cross-examination, Professor Fiscella admitted that he was not trained in ophthalmology and does not perform LASIK surgery. As a pharmacist, he never attended medical school.

Defendants' Experts

In addition to testifying as an adverse witness in Ms. Davis's case in chief, Dr. Kraff testified in his own defense and

as an expert in LASIK surgery and medications that affect the eyes.  Dr. Kraff admitted that at the time of Ms. Davis's surgeries, he believed, as did many ophthalmologists, that patients with abnormally large dilated pupils, such as those between eight and nine millimeters in diameter, would have "slightly increased risk" for developing nighttime vision problems following LASIK surgery.  Dr. Kraff conceded that failure to inform a patient with abnormally large pupils that she had a higher risk for nighttime vision problems before undergoing a LASIK procedure "would have been a deviation" from the standard of care for informed consent in 1998 and 1999.

However, Dr. Kraff insisted that Ms. Davis's pupils at the time of trial were "measuring larger than they were in 1998 and 1999 when I saw her."  It was Dr. Kraff's opinion that Ms. Davis's pupil enlargement was caused by her after-surgery use of the antiallergy medication Allegra-D and antidepressants Zoloft and Cymbalta.  Those medications are known as "selective serotonin reuptake inhibitors" (SSRIs).  Dr. Kraff testified that he read a specific article describing four studies that found SSRIs "have a clinically significant effect on pupil size." However, Dr. Kraff admitted the patients studied in the article were taking two to four times the amount of Zoloft that Ms. Davis had been prescribed.  For his opinion on medication-induced mydriasis, Dr. Kraff also relied on two textbooks: "Ocular Differential Diagnosis" and "Drug-Induced Ocular Side Effects."

On cross-examination, Dr. Kraff admitted that none of the Ohio ophthalmologists that examined Ms. Davis indicated she had mydriasis: "They found large pupils, but they did not write down mydriasis" in their records. He emphasized, however, that "[m]ydriasis means a large pupil." Dr. Kraff admitted that the LASIK procedure he performed on Ms. Davis was a "contributing factor" in her nighttime vision problems, although in his opinion it was not the only cause. He added that he had not personally examined Ms. Davis since 1999.

Dr. Steven Schallhorn, a defense expert in ophthalmology and LASIK surgery, opined that "low light pupil diameter will not predict those patients who will have *** night vision problems, glare, [or] halos" following LASIK. Dr. Shallhorn based his testimony on his analysis of seven peer-reviewed studies published after 1999, the textbook "Drug-Induced Ocular Side Effects," the textbook "Ophthalmic Drugs Facts," for which Professor Fiscella served as a section editor, and his own personal observation of mydriasis related to the use of Allegra-D in rare cases. According to Dr. Schallhorn, the theory that pupil size is related to post-LASIK nighttime vision problems was a "simplistic model," which improperly assumed light rays passing through untreated portions of the cornea and pupil to the retina caused visual problems. Instead, modern research has shown that "light that enters through [the pupil] in the peripheral part of the cornea when the pupil dilates, is much less likely to

12

stimulate that central area [of the retina] and cause flare or halos or difficulty with night vision." In Dr. Schallhorn's opinion, more likely causes of post-LASIK nighttime vision problems include uncorrected refractive error, dry eyes, irregularity of the cornea, and other "high-order aberrations" in the shape of the eye. Dr. Schallhorn testified that the defendants' performance of LASIK surgery on Ms. Davis "[i]n all likelihood" contributed to her nighttime vision issues, but that the LASIK surgery "may not be the only cause."

Dr. Schallhorn admitted he never examined Ms. Davis. He also explained that the studies he relied upon for his opinion were not available at the time of Ms. Davis's surgeries, the first such study was published in 2003. Dr. Schallhorn added that Allegra-D was not a probable contributor to her nighttime vision problems given that Ms. Davis's symptoms did not diminish after she stopped taking Allegra-D for a few days in June 1999. However, he believed there was a difference in the size of Ms. Davis's dilated pupils at the time of her surgeries and her dilated pupil size at the time of trial, which he attributed to "the medications that she was on."

On September 3, 2008, the jury reached a general verdict in favor of the defendants. Ms. Davis filed a posttrial motion for a new trial, which Judge McWilliams denied. Ms. Davis timely appeals.

ANALYSIS

13

No. 1-09-1181

Ms. Davis contends that the circuit court committed reversible errors by allowing defense experts to testify that postsurgical studies called into question the purported link, commonly accepted by ophthalmologists in 1999 and earlier, between abnormally large dilated pupils and nighttime vision problems, and by allowing defense experts to testify that Ms. Davis's abnormally large dilated pupils at the time of trial were caused by certain medications. Ms. Davis filed motions in limine to exclude the contested expert testimony, which the circuit court denied. Ms. Davis objected to the testimony at trial and raised the issues in her posttrial motion, which preserved the claimed errors for appeal. Wilbourn v. Cavalenes, 398 Ill. App. 3d 837, 855, 923 N.E.2d 937 (2010).

Standard of Review

Both of Ms. Davis's contentions concern evidentiary rulings by the circuit court, which are subject to an abuse of discretion review. " 'Whether a motion in limine should be granted is subject to the trial court's discretion.' [Citation.] 'A reviewing court will not reverse a trial court's order allowing or excluding evidence in limine absent a clear showing of an abuse of that discretion.' [Citation.]" Petraski v. Thedos, 382 Ill. App. 3d 22, 26, 887 N.E.2d 24 (2008). Likewise, the decision to admit expert testimony falls within the discretion of the trial court. Petraski, 382 Ill. App. 3d at 27. The abuse of discretion standard is " 'the most deferential standard of review

14

available with the exception of no review at all.' " People v. Coleman, 183 Ill. 2d 366, 387, 701 N.E.2d 1063 (1998), quoting M. Davis, A Basic Guide to Standards of Judicial Review, 33 S.D. L. Rev. 469, 480 (1988). "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." Schwartz v. Cortelloni, 177 Ill. 2d 166, 176, 685 N.E.2d 871 (1997). Thus, a "trial court cannot be said to have abused its discretion if reasonable persons could differ as to its decision." In re Adoption of D., 317 Ill. App. 3d 155, 160, 739 N.E.2d 109 (2000). We limit our analysis to whether the circuit court erred in allowing the defense experts to testify over Ms. Davis's objections at trial. If the circuit court did not err in its rulings during trial, logic dictates that the denial of the pretrial motions in limine could not amount to reversible error. See Magna Trust Co. v. Illinois Central R.R. Co., 313 Ill. App. 3d 375, 395, 728 N.E.2d 797 (2000) ("Violation of a motion in limine is not per se reversible error").

Informed Consent Doctrine

There are four essential elements a plaintiff must prove in a malpractice action based upon the doctrine of informed consent: "(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed

15

treatment." Coryell v. Smith, 274 Ill. App. 3d 543, 546, 653 N.E.2d 1317 (1995). The gravamen in an informed consent case requires the plaintiff to "point to significant undisclosed information relating to the treatment which would have altered her decision to undergo it." Coryell, 274 Ill. App. 3d at 546.

In the case before us, the first element was satisfied when Dr. Kraff testified that the standard of care in 1998 and 1999 required an ophthalmologist to inform a patient with abnormally large pupils that she had a higher risk for nighttime vision problems before obtaining the patient's consent to undergo a LASIK procedure. That the second element--the defendants failed to disclose the risk of nighttime vision problems to Ms. Davis-- was satisfied is not directly challenged by the defendants. Instead, the defendants contend that prior to each LASIK surgery, Ms. Davis did not present abnormally large dilated pupils. Therefore, according to the defendants, the duty to disclose the material risk of nighttime vision problems associated with abnormally large dilated pupils was never triggered by Ms. Davis's dim-light pupils, which the defendants contend measured no larger than six millimeters in diameter. The trial centered on the third and fourth elements of the informed consent doctrine, which each party addressed through the testimony of their respective experts.

To simplify our review, we first note that the overall defense asserted by the defendants is that the duty to disclose

16

was never triggered by the size of Ms. Davis's dilated pupils. This defense presented the jury with a fundamental question of fact: did Ms. Davis present abnormally large dilated pupils prior to each surgery?  (It is uncontested that she had such a condition when she was examined by the Ohio ophthalmologists.) Only if the jury found Ms. Davis to have had abnormally large dilated pupils prior to the surgeries would the jury then need to determine the cause of her nighttime vision problems.  In that instance, the jury could render a verdict in favor of Ms. Davis if the problems she experienced were the result of the heightened and undisclosed risk she faced as a person with abnormally large dilated pupils.

### Third Element

To prove the third element in an informed consent case, Ms. Davis had to persuade the jury that a "reasonable person" in her position would have declined to undergo the LASIK surgeries had the additional risk of nighttime vision problems based on her claimed abnormally large dilated pupils been disclosed. " '[Only] if *** disclosure would have caused a reasonable person in the position of the patient to refuse the surgery or therapy[] [is] a causal connection *** shown.' "  Lisowski v. MacNeal Memorial Hospital Ass'n, 381 Ill. App. 3d 275, 290, 885 N.E.2d 1120 (2008), quoting Schiff v. Friberg, 331 Ill. App. 3d 643, 657, 771 N.E.2d 517 (2002).  In other words, Ms. Davis must present evidence to establish a causal connection between the

17

nondisclosure and her postoperative condition. Lisowski, 381 Ill. App. 3d at 290.

*Fourth Element*

To prove the fourth element in an informed consent case, the plaintiff must demonstrate that the very risk she was uninformed about materialized, causing her injury. Coryell, 274 Ill. App. 3d at 546. If the particular risk did not materialize, the defendant's failure to disclose the risk, however erroneous, cannot give rise to an actionable claim because no showing can be made that the actual injuries suffered by the plaintiff were caused by the treatment. See Schiff, 331 Ill. App. 3d at 657 (to avoid a directed verdict on an informed consent claim, the plaintiff must present some evidence that the undisclosed risk materialized); Canesi ex rel. Canesi v. Wilson, 158 N.J. 490, 504-05, 730 A.2d 805, 812 (1999), citing Canterbury v. Spence, 464 F.2d 772, 790 (D.C. Cir. 1972); Nickell v. Gonzalez, 17 Ohio St. 3d 136, 139, 477 N.E.2d 1145, 1148 (1985) (requiring informed consent plaintiffs to show that "the unrevealed risks and dangers which should have been disclosed by the physician actually materialize[d] and [were] the proximate cause of the injury to the patient"). Thus, the jury could attribute the nighttime vision problems claimed by Ms. Davis to the undisclosed risk only if it first found her claim credible that prior to the surgeries her dilated pupils measured eight or nine millimeters. Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 106, 658 N.E.2d

No. 1-09-1181

450 (1995) ("Without that element [of proximate cause], there would be no case"); Coryell, 274 Ill. App. 3d at 546.

*Materialized Risk*

Before addressing the evidentiary rulings by the circuit court, we first address Ms. Davis's suggestion in her main brief that she was not required to show that the undisclosed risk ever materialized. Relying on her reading of Schiff, Ms. Davis argues in her main brief that an informed-consent plaintiff need not "explain[] the precise mechanism of injury tracing the etiological link between the defendants' actions and the plaintiff's injury."

In Schiff, the plaintiff underwent an emergency colostomy when her bowel perforated during laparoscopic surgery performed by the defendant. Schiff, 331 Ill. App. 3d at 647. The defendant testified that bowel perforations were caused by pre-existing diverticula on the colon that may have ruptured during the surgery. Schiff, 331 Ill. App. 3d at 651, 654-55. The defendant asserted on appeal "that the trial court's denial of a directed verdict on the informed consent count constituted error." Schiff, 331 Ill. App. 3d at 656-57. The defendant claimed "that there was 'no evidence that the bowel was injured by a needle, a trocar, or other instruments' " used by the defendant during the surgical procedure. Schiff, 331 Ill. App. 3d at 657. In the absence of such evidence, " 'neither the specific risk of injury as a consequence of perforation by an

19

instrument nor the "increased risk" from adhesions never [sic] materialized.' " Schiff, 331 Ill. App. 3d at 657. In other words, the plaintiff failed to establish "that her injury was caused by the risk of puncture by surgical instrumentation." Schiff, 331 Ill. App. 3d at 657.

The Schiff court explained that a directed verdict would lie only if the plaintiff failed to establish a prima facie case on the informed consent count. Schiff, 331 Ill. App. 3d at 657. By definition, a prima facie case is established by the presentation of "some evidence on every element essential to [the plaintiff's] cause of action." Kokinis v. Kotrich, 81 Ill. 2d 151, 154, 407 N.E.2d 43 (1980). The Schiff court found the testimony of the plaintiff's expert provided the evidentiary support that the undisclosed risk materialized sufficient to establish a prima facie case. The expert was asked " 'whether, in fact, the perforations were caused by [the defendant doctor's] use of the various instruments during [the plaintiff's] laparoscopic procedure.' " Schiff, 331 Ill. App. 3d at 652. The expert answered, " 'Certainly caused by something that happened during the laparoscopic procedure, yes.' " Schiff, 331 Ill. App. 3d at 652. We ruled the circuit court properly allowed the jury to render a verdict on the informed consent count because the plaintiff had made out a prima facie case of negligence. Schiff, 331 Ill. App. 3d at 657-58. Contrary to Ms. Davis's claim that Schiff stands for the proposition that an informed consent

20

plaintiff need not prove that the undisclosed risk materialized, Schiff stands for the simple proposition that once a prima facie case is made out, it falls to the jury, as finders of fact, to assess the "credibility of witnesses and *** [resolve the] conflicting evidence." Schiff, 331 Ill. App. 3d at 658.

It remained Ms. Davis's burden to prove each of the elements in her informed consent case. Nolan v. Weil-McLain, 233 Ill.2d 416, 430, 910 N.E.2d 549 (2009) ("a plaintiff bears the burden of producing evidence sufficient to establish each element of the claim"); Coryell, 274 Ill. App. 3d at 546. The corollary to this legal proposition is that the defendants were free to challenge the evidence Ms. Davis marshaled on the third and fourth elements of her claim with relevant evidence of their own. Leonardi, 168 Ill. 2d at 101 ("A defendant has the right *** to rebut evidence tending to show that defendant's acts are negligent ***").

### Postsurgery Medical Studies

Ms. Davis first contends that the circuit court committed reversible error in allowing Dr. Schallhorn to testify regarding medical studies, the first of which was published in 2003. The studies found that abnormally large dilated pupils were not predictive of nighttime vision problems. Ms. Davis contends that her medical negligence action based on the doctrine of informed consent should not turn on medical studies that postdate her surgeries in 1998 and 1999. She argues that these postsurgery studies might lead the jury to dilute the standard of care the

21

defendants were required to meet to fully inform Ms. Davis of the risks she faced in the surgeries. To support her argument, Ms. Davis quotes from a construction negligence case: "Postevent literature cannot be used to show the standard of care." Gray v. National Restoration Systems, Inc., 354 Ill. App. 3d 345, 360, 820 N.E.2d 943 (2004). While Ms. Davis's statement of law is accurate, the circuit court's ruling here did not violate the rule of law she quotes.

In the case before us, the circuit court ruled that testimony concerning postsurgical literature was a proper means of challenging Ms. Davis's evidence that she was injured by the LASIK surgeries. See Bergman v. Kelsey, 375 Ill. App. 3d 612, 631-32, 873 N.E.2d 486 (2007) (postevent medical literature admissible if not used "to show the standard of care"). Dr. Markowitz opined that "[i]f the ablation zone [of the eye surgery laser] is smaller than what the pupil dilates to," the patient may perceive glare or other distortions at night following the surgery. Dr. Louis testified that the large size of Ms. Davis's dilated pupils were the cause of her nighttime vision problems. Dr. Siegel opined that light passing through the untreated zone of Ms. Davis's cornea into her unusually large dilated pupils caused her nighttime vision problems. The circuit court admitted Dr. Schallhorn's testimony concerning postsurgical literature to directly challenge these opinions. The postsurgical studies testimony did not pertain to the standard of care in 1998 and

22

1999, which Dr. Kraff conceded required an ophthalmologist to disclose the increased risk of nighttime vision problems to a patient with large dilated pupils.

Dr. Schallhorn's testimony regarding the postsurgery studies constituted relevant evidence that Ms. Davis's nighttime vision problems were not the result of her dilated pupils exceeding the zone of the largest eye surgery laser available in 1998 and 1999. Dr. Schallhorn testified that "low light pupil diameter will not predict those [LASIK] patients who will have *** night vision problems," problems he attributed to uncorrected refractive error, dry eyes, corneal irregularity, and other "high-order aberrations." Stated in terms of the fourth element of Ms. Davis's informed consent case, the defendants introduced this evidence to support their contention that Ms. Davis was not "injured" by the LASIK surgery even if her dilated pupils measured eight or nine millimeters at the time of the surgeries, which the defendants' evidence disputed. See Coryell, 274 Ill. App. 3d at 546. The postsurgery studies called into question the generally held belief among ophthalmologists in 1999--a belief apparently held by the plaintiff's experts at the time of trial-- that light striking an untreated portion of the cornea as the light passes through the pupil to the retina causes post-LASIK glare, the precise injury claimed by Ms. Davis.

We also agree with the circuit court that Ms. Davis's

concern that the jury might misapply the testimony amounts to no more than speculation, as Ms. Davis cannot demonstrate that the jury did in fact erroneously rely on such evidence to undermine the standard of care that prevailed in 1998 and 1999.  See Eizerman v. Behn, 9 Ill. App. 2d 263, 279-80, 132 N.E.2d 788 (1956) ("evidence *** competent for one purpose does not become incompetent because the jury might improperly consider it in some other capacity for which it could not properly be admitted").  The opposing party must request a limiting instruction or forfeit the issue.  Eizerman, 9 Ill. App. 2d at 280 (if the opponent to such evidence fails to request a limiting instruction, "he is deemed to have waived any objection he may have").

The circuit court acted within its discretion in ruling Dr. Schallhorn's testimony, regarding the studies published after Ms. Davis's surgery, probative on the disputed elements of the plaintiff's informed consent theory.

Medication-Induced Mydriasis

Ms. Davis contends the circuit court committed a second reversible error in rejecting her objections at trial to the opinions of Drs. Kraff and Schallhorn that her mydriasis (enlarged pupil size) was caused by her use of certain antiallergy and antidepressants following surgery.  Ms. Davis challenges the circuit court's ruling on four grounds.

First, Ms. Davis argues that the opinions of Drs. Kraff and

Schallhorn connecting medication with her large pupil size are grounded on conjecture and speculation because no evidentiary basis exists to support the opinions. "[A]n expert's opinions and conclusions are still subject to the fundamental requirement that they have some evidentiary basis." Simers v. Bickers, 260 Ill. App. 3d 406, 411, 632 N.E.2d 219 (1994). "When the opinion of an expert is totally lacking in factual support it is nothing more than conjecture and guess and should not be admitted as evidence." Harris Trust & Savings Bank v. Otis Elevator Co., 297 Ill. App. 3d 383, 393, 696 N.E.2d 697 (1998).

To support her contention, Ms. Davis marshals the testimony of her experts as to the size of her dilated pupils to demonstrate a lack of evidentiary basis for the opinions of the defendants' experts. Ms. Davis jumps from the uncontested fact that her pupils measured abnormally large when she was examined by the Ohio ophthalmologists, between eight and nine millimeters in diameter, to her claim that her pupils were abnormally large in dim lighting prior to the surgeries, a contention supported by a photograph taken prior to her surgeries apparently showing that she had large dilated pupils in 1995.

The problem with Ms. Davis's claim is that the jury also had before it testimony by KEI employees that Ms. Davis's pupil diameter measured five millimeters in dim light before her first surgery and six millimeters in dim light before her second

25

surgery. The jury was also shown the videotapes of each LASIK surgery. Dr. Kraff testified that the videotape of Ms. Davis's first LASIK surgery showed Ms. Davis's pupils measured six millimeters in dim light. Dr. Schallhorn testified that the videotape of Ms. Davis's second LASIK surgery showed Ms. Davis's pupils varying in diameter from "three [to] maybe a little less than six" millimeters, depending on the lighting conditions.

We are aware of no authority that the defendants' evidence, directly contradicting Ms. Davis's claim that she had abnormally large dilated pupils prior to her surgeries, can somehow be disregarded in assessing the evidentiary support of the expert testimony introduced at trial. As we pointed out above, if the jury determined that Ms. Davis's dilated pupils measured no greater than six millimeters presurgeries, consistent with the defendants' contentions, then the entirety of Ms. Davis's informed consent claim necessarily failed. See Leonardi, 168 Ill. 2d at 106 ("Without that element [of proximate cause], there would be no case"). Ms. Davis would simply not fall within the group of LASIK patients that had a greater risk of nighttime vision problems if her dilated pupils did not exceed the zone of coverage of the eye surgery lasers available in 1998 and 1999.

Ms. Davis's reliance on this court's ruling in Simers for support that the opinions of Drs. Schollhorn and Kraff were based on "conjecture and speculation" is simply misguided. In Simers,

26

the defendant fitted the plaintiff with a pair of soft contact lenses. Simers, 260 Ill. App. 3d at 408. Following the fitting, the plaintiff complained of dry, itchy eyes, which the defendant treated with eye drops, stressing the importance of disinfecting the lenses after use. Simers, 260 Ill. App. 3d at 408. The plaintiff continued to experience eye problems, which caused her to be seen by numerous other eye professionals. Simers, 260 Ill. App. 3d at 408. Her problems worsened to the point that she was hospitalized with symptoms of near blindness. Simers, 260 Ill. App. 3d at 409. The plaintiff sued, contending her vision problems were caused by the negligent fitting of the contact lens by the defendant. Simers, 260 Ill. App. 3d at 410-11. The defendant's expert testified that the plaintiff's vision problems were caused by an infection, which developed from improper cleaning of the contact lens by the plaintiff. Simers, 260 Ill. App. 3d at 410-11. He testified his opinion was based on the hospital records, the depositions of the treating doctors, and photographs of the plaintiff's eyes. Simers, 260 Ill. App. 3d at 412. The jury returned a verdict in the defendant's favor. Simers, 260 Ill. App. 3d at 407. The Simers court reversed.

Based on the definition of conjecture as "a conclusion based on assumption not in evidence or contradicted by the evidence" (Simers, 260 Ill. App. 3d at 412, citing Nelson v. Speed Fastener, Inc., 101 Ill. App. 3d 539, 428 N.E.2d 495 (1981)), the

27

court held there was "no factual, scientific or expert evidence to support" the defense expert's opinion that the plaintiff's vision problems were infection-based when the record was barren of any evidence of bacteria in the culture of the cleaning solution the plaintiff used to care for her contact lens. Simers, 260 Ill. App. 3d at 412. In the absence of any evidence to support the defense expert's opinion "that plaintiff's eyes were infected due to her own lack of proper cleaning," the opinion was conjecture. Simers, 260 Ill. App. 3d at 413. As conjecture, the expert's opinion should never have been admitted at trial. See Harris Trust, 297 Ill. App. 3d at 393 ("When the opinion of an expert is totally lacking in factual support it is nothing more than conjecture and guess and should not be admitted as evidence").

In the instant case, that Drs. Schollhorn and Kraff testified that Ms. Davis's enlarged dilated pupils at the time of trial may have been caused by certain medications she was taking was not a concession that Ms. Davis's pupils dilated to eight or nine millimeters prior to the surgeries. The evidence conflicted as to the size of Ms. Davis's dilated pupils prior to each surgery. The conflict in the evidence as to Ms. Davis's dilated pupil size prior to surgery provided evidentiary support for the explanation offered by the defendants that Ms. Davis's abnormally sized dilated pupils as testified to at trial were medication-

28

induced.  Consistent with this contention, Ms. Davis testified that following her surgeries she had been prescribed a class of drugs that the defendants' experts linked to enlarged pupils. Drs. Schollhorn and Kraff relied on scientific evidence, including authoritative textbooks and their own experience to offer the explanation that Ms. Davis's enlarged pupils at the time of trial were medication related.  The experts were thoroughly cross-examined on their opinions; we are aware of no authority that dictates that their opinions could not be considered by the jury.

On the record before us, we find an evidentiary basis for the conflicting opinions of the experts offered by both sides. We reject Ms. Davis's claim that the opinions of the defendants' experts were based on speculation and conjecture.  See Harris Trust, 297 Ill. App. 3d at 393-94 (trial court erred in directing a verdict when record evidence minimally supported claim of direct negligence against elevator company based on a reasonable inference that an employee manipulated controls to allow elevator to operate in an unsafe condition); Lisowski, 381 Ill. App. 3d at 289 (when patient's state of mind at time consent given for surgical procedure is disputed, it falls to the jury to resolve the dispute); Bergman, 375 Ill. App. 3d at 625-26 (it is within the province of the jury to resolve evidentiary conflicts).

Second, Ms. Davis claims that the opinions should have been

excluded because Dr. Kraff's opinion is contradicted by his own testimony that he personally ruled out medication-induced mydriasis as a diagnosis after Ms. Davis's symptoms did not improve when he told her to stop using Allegra-D in June 1999. Ms. Davis, however, fails to set out the testimony by Dr. Kraff that purportedly contradicts his opinion to support her contention. Our review of the record reveals no such testimony by Dr. Kraff.

Dr. Kraff never diagnosed Ms. Davis with mydriasis, medication-induced or not. As we noted, according to the defendants' records, Ms. Davis's dim-light pupils never exceeded six millimeters presurgery. To rebut the inference from the plaintiff's experts that Ms. Davis likely had abnormally large dilated pupils prior to her surgeries, Dr. Kraff testified that several prescriptions, not limited to Allegra-D, could have caused Ms. Davis's later mydriasis. Even if Dr. Kraff had ruled out Allegra-D as a cause of her nighttime vision problems after she claimed to have stopped taking it for several days, no testimony is quoted that he ruled out the additional prescription drugs Ms. Davis was taking, including Zoloft and Cymbalta.

There is also no basis to discount the testimony of Dr. Schallhorn and Dr. Kraff simply because neither examined Ms. Davis after 1999. As experts, their opinions were based upon Ms. Davis's medical history, review of authoritative textbooks and

studies, and personal experience.  It is unfair to characterize their testimony as conjecture based on the absence of an examination of Ms. Davis near the date of her trial when she fails to provide us with direct authority to support that claim. Drs. Schallhorn and Kraff did not rely on implied facts not present in the medical records to reach their opinions (see Coffey v. Brodsky, 165 Ill. App. 3d 14, 25, 518 N.E.2d 638 (1987)); nor did they base their opinions on their own later investigations when circumstances may have changed (see Dyback v. Weber, 114 Ill. 2d 232, 244-45, 500 N.E.2d 8 (1986)).  Their opinions had adequate factual and scientific bases; the defendants were entitled to present them to the jury.

Ms. Davis also seeks to make much of the absence of a diagnosis of mydriasis by her three Ohio ophthalmologists or Dr. Siegel.  We find no basis to question Dr. Kraff's assertion that mydriasis merely describes an enlarged dilated pupil, a condition the four doctors noted present in Ms. Davis after 1999 and in the 1995 photograph.  That no diagnosis of medication-induced mydriasis was made simply reflects a difference of opinion concerning the cause of her enlarged pupils, not the absence of evidentiary support for the opinions of the defense experts simply because they are contrary to the opinions of the plaintiff's experts.  The disagreement over the cause of Ms. Davis's enlarged pupils, or mydriasis, was for the jury to

resolve. Lisowski, 381 Ill. App. 3d at 289; Bergman, 375 Ill. App. 3d at 625-26.

Third, Ms. Davis contends that the opinions of Drs. Schallhorn and Kraff improperly relied upon general pharmacy texts. Our reading of the record reflects that the general pharmacy texts were not the only bases for the offered opinions. Dr. Schallhorn testified that his opinion was additionally based upon his own experience of medication-induced mydriasis in rare cases. Dr. Kraff testified that his opinion was additionally based upon a specific article linking large pupils with certain medications Ms. Davis was using.

Professor Fiscella testified that the general language in the texts called into question whether medication-induced mydriasis could be linked to a specific drug. The testimony of Drs. Schallhorn and Kraff sought to establish such a link with the drugs Ms. Davis had taken postsurgery. It then fell to Ms. Davis "to challenge the sufficiency or reliability of the basis for the expert's opinion during cross-examination, and[, if the opinions are not excluded,] the determination of the weight to be given the expert's opinion is left to the finder of fact." Adams v. Family Planning Associates Medical Group, Inc., 315 Ill. App. 3d 533, 550, 733 N.E.2d 766 (2000). While Ms. Davis may have effectively challenged the opinions of the defense experts through the testimony of her own experts (Adams, 315 Ill. App. 3d

32

at 550), it was the province of the jury to resolve this battle between the experts. Lisowski, 381 Ill. App. 3d at 289; Bergman, 375 Ill. App. 3d at 625-26.

Finally, Ms. Davis argues that neither Dr. Kraff nor Dr. Schallhorn was qualified to give an opinion regarding medication-induced mydriasis. "Expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." Snelson v. Kamm, 204 Ill. 2d 1, 24 (2003). As for medical experts, "the physician must be a licensed member of the school of medicine about which he proposes to testify" and must be " 'familiar with the methods, procedures, and treatments ordinarily observed by other physicians.' " Jones v. O'Young, 154 Ill. 2d 39, 43, 607 N.E.2d 224 (1992), quoting Purtill v. Hess, 111 Ill. 2d 229, 243 (1986).

Ms. Davis essentially argues that Drs. Kraff and Schallhorn, as ophthalmologists, were not competent to offer opinions concerning the effects of medications on the pupils because their specialty fell outside the fields of pharmacy or pharmacology, a new twist on her third basis to exclude the defense opinions. The "same school of medicine rule" requires only that an expert be licensed in the same field to give testimony on the medical negligence standard of care. Ruffin v. Boler, 384 Ill. App. 3d 7, 19, 890 N.E.2d 1174 (2008). As we made clear above, the

33

standard of care was not disputed by the defendants; nor were the opinions of Dr. Kraff and Dr. Schallhorn introduced for that purpose. The "same school of medicine rule" does not apply to a defense expert's testimony that addresses only the causation and injury issues. Ruffin, 384 Ill. App. 3d at 19 ("The restriction as to who may serve as an expert applies to testimony 'concerning the standard of care' " (emphasis in original), quoting Greenburg v. Michael Reese Hospital, 83 Ill. 2d 282, 291-92, 415 N.E.2d 390 (1980)).

We also note Ms. Davis sued an ophthalmologist; we are aware of no authority that prevents an ophthalmologist from giving an opinion in a suit against an ophthalmologist. See Schiff, 331 Ill. App. 3d at 658 (claim rejected that plaintiff's medical expert with "board certification in gynecology" not qualified to testify against medical defendant with "board certification in gynecology, reproductive endocrinology and fertility"). As the defendants emphasize in their brief, Ms. Davis seems to suggest that no medical doctor is competent to testify to the side effects of medications even though they are licensed to write prescriptions. Such a rule would be unprecedented.

We reject each of Ms. Davis's arguments that the opinions of the defense experts should have been excluded from the jury as to medication-induced mydriasis.

General Verdict

34

In addressing each of the issues raised on appeal by Ms. Davis, we found no error in the circuit court's rulings. We nonetheless point out that even if we were to rule that the circuit court erred in admitting the defense experts' testimony, neither separately nor in combination would the errors be reversible. Each alleged error could have been meaningless. See Tabe v. Ausman, 388 Ill. App. 3d 398, 404-05, 902 N.E.2d 1153 (2009) ("The jury's analysis here might well have concluded with a verdict in favor of the defendant doctors without reaching the [disputed] element ***").

The jury may well have decided that the defendants accurately measured Ms. Davis's dim-light pupils prior to each surgery at no more than six millimeters. Such a factual finding by the jury would preclude the necessary foundation to trigger the defendants' duty to disclose the material risk based on abnormally large dilated pupils because Ms. Davis presented dim-light pupils within the normal range in 1998 and 1999. If Ms. Davis had dim-light pupils within the normal range, as the defense evidence tended to show, then Ms. Davis never actually faced the material risk she claimed the defendants failed to disclose to her and could not have been injured by the LASIK procedures. See Coryell, 274 Ill. App. 3d at 546. Without a special interrogatory that reveals the jury's findings on this dispositive factual issue, our review of the jury's general

35

verdict is foreclosed. "[If] the mental processes of the jury have not been tested by special interrogatories to indicate which of the [multiple] issues was resolved in favor of the successful party, it will be presumed that all issues were so determined ***.' " Strino v. Premier Healthcare Associates, P.C., 365 Ill. App. 3d 895, 904, 850 N.E.2d 221 (2006), quoting H.E. Culbertson Co. v. Warden, 123 Ohio St. 297, 303, 175 N.E. 205, 207 (1931).

CONCLUSION

As commonly happens in a medical malpractice case, the persuasiveness of Ms. Davis's action boiled down to which of the opposing experts persuaded the jury. In the course of allowing the defendants to challenge the disputed elements of the plaintiff's informed consent case, the circuit court properly admitted the testimony of the defendants' expert on postevent studies and medication-induced mydriasis over the numerous objections by Ms. Davis. The circuit court properly admitted such relevant testimony to assist the jury in reaching a fair verdict. We find no grounds to grant Ms. Davis a new trial.

Affirmed.

CAHILL and MCBRIDE, JJ., concur.

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

**MARLA DAVIS,**
         **Plaintiff-Appellant,**
         v.
**COLMAN KRAFF and KRAFF EYE INSTITUTE, LTD.,**
         **Defendants-Appellees.**

### No. 1-09-1181

**Appellate Court of Illinois**
**First District, First Division**

**Filed: October 8, 2010**

**JUSTICE GARCIA delivered the opinion of the court.**

**CAHILL and MCBRIDE, JJ., concur.**

**Appeal from the Circuit Court of Cook County**
**Clare E. McWilliams, Judge Presiding**

| For PLAINTIFF-APPELLANT | STEINBERG, GOODMAN & KALISH |
|---|---|
| | Bruce D. Goodman |
| | Peter M. Dapier |
| | Bradley D. Steinberg |
| | 20 North Clark Street, 31st Floor |
| | Chicago, Illinois 60602 |
| For DEFENDANTS-APPELLEES | DONOHUE, BROWN, MATHEWSON & SMYTH, LLC |
| | Richard B. Foster |
| | Karen Kies DeGrand |
| | Timothy L. Hogan |
| | 140 South Dearborn Street, Suite 800 |
| | Chicago, Illinois 60603 |